UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
MORGANNE MILES, by her mother KRYSTAL MILES,
et al.,

                             Plaintiffs,

                      - against -

MICHAEL O. LEAVITT, as Secretary of the United
States Department of Health and Human Services,

                        Defendant.

---------------------------------------------------------------x

**08 Civ. 432 (PAC)**

**ECF CASE**

## STATEMENT OF MATERIAL FACTS NOT IN CONTROVERSY

PURSUANT TO LOCAL CIVIL RULE 56.1 Plaintiffs submit that the following

facts are not in controversy:

1.      Plaintiffs Morganne Miles, age 4, and Olivia Miles, age 1, live with their

         mother, Krystal Miles, and their Father, Corey Miles, in Gorham, New York.

         (Miles Dec. ¶ 1-2)

2.      Morganne Miles was enrolled in subsidized health insurance coverage under

         New York's Child Health Plus (CHPlus) in September of 2007. (Miles Dec. ¶

         11)

3.      Krystal Miles paid $20 to enroll Morganne in CHPlus for September and

         planned to enroll Olivia at the same rate when her Child Health Plus coverage

expired on her first birthday. (Miles Dec. ¶ 11)

4.      Later in September 2007 Ms. Miles was notified by letter that she would in

fact need to pay the full unsubsidized premium of $196 per month for health

insurance coverage for her child Morganne, as opposed to the $20 reduced

monthly premium that she had anticipated and had paid, . (Miles Dec. ¶ 12)

5.      Ms. Miles could not afford to pay the almost ten times greater monthly

premium to insure Morganne or Olivia. (Miles Dec. ¶ 12)

6.      Morganne and Olivia were forced to go without health insurance coverage

from October until December of 2007 when Ms. Miles was able to find  a new

job that provided health insurance at a cost that her family could only afford

by using money that would have paid for groceries and other necessities.

(Miles Dec. ¶¶ 13 and 15)

7.      Health coverage expenses consume approximately 10% of the Miles family's

net monthly income.  The remainder of their income is spent on basic

necessities and work expenses like child care and car expenses. (Miles Dec. ¶¶

6 and 7)

8.      Ms. Miles has been forced to take a job with hours (4 pm to midnight) that

force her to spend dinner time and bedtime away from her children and

husband in order to provide health care coverage that her children desperately need both for preventive care and existing conditions, like repair of Olivia's hernia. (Miles Dec. ¶¶ 13 and 15 - 18)

9.    Ms. Miles now pays $296.44 per month to insure her family through her employer. (Miles Dec. ¶ 15)

10.    Plaintiff Pascale Mossin, age 2 ½, resides with her mother, Amy Margaret McCutchin, in New York, New York. (McCutchin Dec. ¶ 1-2)

11.    Pascale was in receipt of subsidized health care coverage under CHPlus in September of 2007. (McCutchin Dec. ¶ 15-16)

12.    Amy Margaret McCutchin paid $20 to Empire Blue Cross Blue Shield for coverage for the month of September 2007. (McCutchin Dec. ¶ 14)

13.    In September 2007 Ms. McCutchin received a letter from Empire Blue Cross Blue Shield stating that she would in fact need to pay $533.16 for a three-month period beginning September 1, 2007, or a full $177.72 monthly premium, as opposed to the $20 reduced monthly premium that she had anticipated and paid for. (McCutchin Dec. ¶ 17)

14.    Ms. McCutchin is now paying a full $177.72 monthly premium for CHPlus

for Pascale. (McCutchin Dec. ¶ 18)

15.    Paying for unsubsidized health insurance coverage Pascale is very difficult for

Ms. McCutchin, given her income, but she is willing to go without other

needed items to make sure Pascale has coverage for both preventive care and

in case of an emergency need. (McCutchin Dec. ¶¶ 19 - 22)

16.    Plaintiffs Theo Chan, age 3 ½, and Leah Chan, age 5 months, live with their

father, Sunny Chan, and their mother, Edith Tay, in Brooklyn, New York.

(Chan Dec. ¶ 1-2)

17.    Theo and Leah were in receipt of CHPlus in October of 2007 at the subsidized

premium rate of $40 per month per child. (Chan Dec. ¶ 11)

18.    Sunny Chan wrote a check for $80 for coverage for the month of October

2007 for both of his children. (Chan Dec. ¶ 11)

19.    One week later Mr. Chan was notified by a facilitated enroller at the

Children's Aid Society that he would in fact need to pay the full $355 per

month to insure both of his children, as opposed to the $40 per child reduced

monthly premium that he had anticipated and paid. (Chan Dec. ¶ 11)

20.    Mr. Chan is now paying a full $355 monthly premium for CHPlus for Theo

and Leah. (Chan Dec. ¶ 13)

21.     Mr. Chan makes these payments, despite the financial hardship they cause his family, because of his concern that his children have medical needs that must be met both proactively for things like the many check-ups and vaccinations needed for young children and to deal with the existing conditions of Theo (food allergies that have yet to be pinpointed) and Leah (severe bronchitis). (Chan Dec. ¶ 13 and 16 - 18)

22.     On August 17, 2007 Dennis G. Smith the Director of the Center for Medicaid and State Operations in the Department of Health and Human Services issued a directive, addressed to State Health Officials and numbered SHO #07-001. A true and complete copy of that directive is attached as Exhibit A.

23.     The directive sets forth additional criteria that CMS will use to evaluate SCHIP programs. It states: "CMS will apply this review strategy to SCHIP state plans and section 1115 demonstration waivers that include SCHIP populations, and will work with States that currently provide services to children with effective family incomes over 250 percent of the FPL. We expect affected states to amend their SCHIP state plans (or 1115 demonstration) in accordance with this review strategy within 12 months, or CMS may pursue corrective action."

24.   Defendant did not promulgate the new criteria for reviewing SCHIP State Plan Amendments and re-reviewing existing SCHIP programs over the next 12 months through publication of notice of proposed new criteria in the Federal Register and allowing public comment by those who might be affected by the new criteria. (Exhibit A).

25.   On September 7, 2007, Defendant denied the SCHIP state plan amendment that New York had filed on April 12, 2007,  based on the new criteria for evaluating state plan amendments promulgated in the August 17 Directive. (Exhibit A to Turner Dec., *State of New York v. U.S Dep't HHS*, 07-CV-8621 (PAC); Arnold Dec., *State of New York v. U.S Dep't HHS*, 07-CV-8621 (PAC) ¶¶ 9, 21).

*s/ Bryan D. Hetherington*

_____
Bryan D. Hetherington
One of Plaintiffs' Attorneys
Empire Justice Center
One West Main Street, Suite 200
Rochester, NY  14614
Telephone: (585) 454-4060

April 16, 2008

# Exhibit A

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland 21244-1850



**Center for Medicaid and State Operations**

**August 17, 2007**                                                                 SHO #07-001
Dear State Health Official:

This letter clarifies how the Centers for Medicare & Medicaid Services (CMS) applies existing
statutory and regulatory requirements in reviewing State requests to extend eligibility under the
State Children's Health Insurance Program (SCHIP) to children in families with effective family
income levels above 250 percent of the Federal poverty level (FPL). These requirements ensure
that extension of eligibility to children at these higher effective income levels do not interfere
with the effective and efficient provision of child health assistance coordinated with other
sources of health benefits coverage to the core SCHIP population of uninsured targeted low
income children.

Section 2101(a) of the Social Security Act describes the purpose of the SCHIP statute "to initiate
and expand the provision of child health assistance to uninsured, low-income children in an
effective and efficient manner that is coordinated with other sources of health benefits coverage."
Section 2102(b)(3)(C) of the Act, and implementing regulations at 42 CFR Part 457, Subpart H,
require that State child health plans include procedures to ensure that SCHIP coverage does not
substitute for coverage under group health plans (known as "crowd-out" procedures). In
addition, section 2102(c) of the Act requires that State child health plans include procedures for
outreach and coordination with other public and private health insurance programs.

Existing regulations at 42 C.F.R. 457.805 provide that States must have "reasonable procedures"
to prevent substitution of public SCHIP coverage for private coverage. In issuing these
regulations, CMS indicated that, for States that expand eligibility above an effective level of 250
percent of the FPL, these reasonable crowd-out procedures would include identifying specific
strategies to prevent substitution. Over time, States have adopted one or more of the following
five crowd-out strategies:

- Imposing waiting periods between dropping private coverage and enrollment;
- Imposing cost sharing in approximation to the cost of private coverage;
- Monitoring health insurance status at time of application;
- Verifying family insurance status through insurance databases; and/or
- Preventing employers from changing dependent coverage policies that would favor a
  shift to public coverage.

As CMS has developed more experience and information from the operation of SCHIP
programs, it has become clear that the potential for crowd-out is greater for higher income
beneficiaries. Therefore, we are clarifying that the reasonable procedures adopted by States to
prevent crowd-out pursuant to 42 C.F.R. 457.805 should include the above five general crowd-
out strategies with certain important components. As a result, we will expect that, for States that
expand eligibility above an effective level of 250 percent of the FPL, the specific crowd-out

Page 2 - State Health Official

strategies identified in the State child health plan to include all five of the above crowd-out strategies, which incorporate the following components as part of those strategies:

- The cost sharing requirement under the State plan compared to the cost sharing required by competing private plans must not be more favorable to the public plan by more than one percent of the family income, unless the public plan's cost sharing is set at the five percent family cap;
- The State must establish a minimum of a one year period of uninsurance for individuals prior to receiving coverage; and
- Monitoring and verification must include information regarding coverage provided by a noncustodial parent.

In addition, to ensure that expansion to higher income populations does not interfere with the effective and efficient provision of child health assistance coordinated with other sources of health benefits coverage, and to prevent substitution of SCHIP coverage for coverage under group health plans, we will ask for such a State to make the following assurances:

- Assurance that the State has enrolled at least 95 percent of the children in the State below 200 percent of the FPL who are eligible for either SCHIP or Medicaid (including a description of the steps the State takes to enroll these eligible children);
- Assurance that the number of children in the target population insured through private employers has not decreased by more than two percentage points over the prior five year period; and
- Assurance that the State is current with all reporting requirements in SCHIP and Medicaid and reports on a monthly basis data relating to the crowd-out requirements.

We will continue to review all State monitoring plans, including those States whose upper eligibility levels are below an effective level of 250 percent of the FPL, to determine whether the monitoring plans are being followed and whether the crowd-out procedures specified in the SCHIP state plans are reasonable and effective in preventing crowd-out.

CMS will apply this review strategy to SCHIP state plans and section 1115 demonstration waivers that include SCHIP populations, and will work with States that currently provide services to children with effective family incomes over 250 percent of the FPL. We expect affected States to amend their SCHIP state plan (or 1115 demonstration) in accordance with this review strategy within 12 months, or CMS may pursue corrective action. We would not expect any effect on current enrollees from this review strategy, and anticipate that the entire program will be strengthened by the focus on effective and efficient operation of the program for the core uninsured targeted low-income population. We appreciate your efforts and share your goal of providing health care to low-income, uninsured children through title XXI.

Page 3 - State Health Official

If you have questions regarding this guidance, please contact Ms. Jean Sheil, Director, Family and Children's Health Programs, who may be reached at (410) 786-5647.

Sincerely,

/s/

Dennis G. Smith
Director

cc:

CMS Regional Administrators

CMS Associate Regional Administrators,
    Division of Medicaid and Children's Health

Martha Roherty
Director, Health Policy Unit
American Public Human Services Association

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Matt Salo
Director of Health Legislation
National Governors Association

Debra Miller
Director for Health Policy
Council of State Governments

Christie Raniszewski Herrera
Director, Health and Human Services Task Force
American Legislative Exchange Council

Jacalyn Bryan Carden
Director of Policy and Programs
Association of State and Territorial Health Officials

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MORGANNE MILES, by her mother KRYSTAL TITUS,
et al.,                                                                          **08 Civ. 432 (PAC)**
                                            Plaintiffs,
                                                                                 **ECF CASE**


                    - against -

MICHAEL O. LEAVITT, as Secretary of the United
States Department of Health and Human Services,

                            Defendant.


-----------------------------------------------------------------x


### DECLARATION OF KRYSTAL MILES

        KRYSTAL MILES declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

        1.      I am the mother of Morganne Miles, age 4, and Olivia Miles, age 1.  I respectfully

submit this declaration in support of this action.

        2.      I live with my husband, Cory Miles, and my daughters, Morganne and Olivia

Miles, at 2646 Main Street, Gorham, New York 14461.

        3.      My family and I are being injured because without the expansion in eligibility for

the Child Health Plus program in New York, our family is suffering financial and emotional

hardship.

        4.      I work full time as an operator on the manufacturing line at Pactiv Corporation, a

factory that makes paper products.  Cory works full time as a stone fabricator for MCM Natural

Stone. We both work overtime whenever it is available because we are not earning enough to

1

make ends meet.

    5.      In 2007, our family's net annual income was $50, 085.00 (Cory made $29,217.00 and Krystal made $20, 868.00). Our net income so far for 2008 is $6,305.80 (Cory's YTD is $3,763.80 and Krystal's YTD is $2,542.00).

    6.      Our monthly income varies somewhat depending on whether either of us can get some overtime. Without overtime our family's net monthly income is $3,122.08 (Cory makes 503.80 per week and Krystal makes $554.64 bi-monthly). We have been shopping for clothes and shoes at the Salvation Army and cutting back on some basic necessities like groceries in order to try to make ends meet. Our cable, internet and home telephone have all been disconnected at various times because we cannot afford to pay for them.

    7.      Our regular monthly expenses are as follows:

| EXPENSE | MONTHLY AM'T |
|---|---:|
| Rent | $600.00 |
| Health and Dental Expenses | $316.44 |
| Child Care | $200.00 |
| Car Payment | $215.00 |
| Car Insurance | $177.00 |
| Heat and Electric | $220.00 |
| Telephone | $150.00 |
| Child Support | $286.52 |
| Gasoline | $320.00 |
| Car Maintenance | $30.00 |

2

| | |
|---|---|
| Clothes and Shoes | $100.00 |
| Groceries | $300.00 |
| **TOTAL** | **$2,914.96** |

8. We also have financial debt that is putting great strain and pressure on our family. We would like to begin paying off our debts but we have not been able to afford to yet. Our debt is as follows:

| DEBT | TOTAL AM'T OWED |
|---|---|
| Credit Card (Cory) | $1,500.00 |
| NYS Electric & Gas | $1,800.00 |
| Hospital ER Debt | $400.00 |
| Unemployment Overpayment (Cory) | $687.50 |
| **TOTAL** | **$4,687.50** |

9. From June of 2004 to December of 2007 I worked as a manager at a Wendy's restaurant. Our daughter Morganne was insured under my health insurance policy at Wendy's until January of 2007, when I was forced to take her off of the insurance policy because we could not afford the premium.

10. Our daughter Olivia was enrolled in Medicaid when she was born. Her Medicaid coverage ended December 1, 2007. At that point she became uninsured because we could not afford to add her to my health insurance policy at Wendy's.

11. In August of 2007 I went to the F.F. Thompson Health Center to enroll Morganne

3

under the new expanded Child Health Plus B (CHPlus B) program. At that time Olivia was still

covered under Medicaid. I anticipated that we would be able to buy insurance for Morganne for

a monthly premium of $20.00. When I went to F.F. Thompson I was told that Morganne did in

fact qualify at the $20.00 premium level. I applied and submitted a $20 money order to enroll

Morganne. I planned to enroll Olivia in CHPlus B when her coverage under Medicaid expired

upon her first birthday.

12.     In September of 2007 I was informed in writing that we would not in fact be

eligible to enroll Morganne at the $20.00 premium level and that we would need to pay the full

premium of $196 per month in order for Morganne to have health insurance. Paying these new

premiums at the enhanced level would have placed unbearable financial pressure and strain on

our family.

13.     In December of 2007 I left my job at Wendy's to take a job at the Pactiv

Corporation because we desperately needed health insurance coverage for our daughters. I am

working the 4:00pm to midnight shift at Pactiv which means that I am not home for dinnertime

and bedtime with my girls. Cory works during the day so I hardly ever see him either which puts

great emotional strain on our marriage and in turn our family. I know that I am missing out on

valuable time with my daughters and my husband but I feel as though I had no choice other than

to take this job.

14.     Cory was uninsured for 6 years, since the time he left his last job as a machine

operator at Pactiv, because his current employer does not offer health insurance. He began

receiving health insurance under my employer's health insurance policy after we were married,

in February of 2008.

15.     Although I have been able to get insurance for my family through my current

4

employer, it is very expensive and the money that comes out of my paycheck for the premiums is money that we need for groceries and other basic necessities. To cover my family I am paying $256.92 per month for health insurance, $12.14 per month for dental insurance and $27.38 per month for vision insurance. This is putting great financial strain on our family.

16.     Not having health insurance for our children caused me a lot of emotional stress. Both of my daughters are developing so quickly. Cory and I know that it is important to bring them to the doctor for regular check-ups to make sure that they are developing properly. Morganne's doctor thinks that she may have eczema and he would like her to see a dermatologist. Olivia will need her 18-month vaccinations in May. Without regular check-ups, we worried that we might miss an important vaccination or some condition or problem that needed treatment and therefore do our daughters lasting harm.

17.     We also knew that we needed to get health insurance coverage for our daughters despite the financial and emotional strain on our family because our daughters will have medical needs. We already know that Olivia has a baby hernia. The doctor told us that she may need to have surgery if it does not get better.

18.     We also knew that we needed to have health insurance for our daughters in case of an emergency. We were terrified that an emergency would arise for either Olivia or Morganne, and they wouldn't get all the services they need because they were uninsured. We already have medical debt for treatment Cory received when he had to go to the emergency room because of an ear infection when he was uninsured.   We worried that we would face new, impossible levels of medical debt for any emergency care that a hospital does provide.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2008.

s/Krystal Miles

_____

KRYSTAL MILES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MORGANNE MILES, by her mother KRYSTAL TITUS, et al.,

**08-CV-432 (PAC)**

               Plaintiffs,

**ECF CASE**

      - against -

**DECLARATION**

MICHAEL O. LEAVITT, as Secretary of the United
States Department of Health and Human Services,

               Defendant.

------------------------------------------------------------------------x

### DECLARATION OF AMY MARGARET MCCUTCHIN

AMY MARGARET MCCUTCHIN declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the mother of Pascale Mossin, age 2½. I respectfully submit this declaration in support of this action.

2.      My daughter Pascale and I reside at 1 Union Square South, Apt. 15A, New York, New York 10003.

3.      We are being injured because, without the expansion in eligibility for the Child Health Plus program (CHPlus) in New York State, I cannot afford quality health insurance for my daughter Pascale.

4.      I am married, but I have recently separated from my husband, Kyril Mossin.

1

5.    I obtained full legal and physical custody of Pascale as of October 23, 2007. Kyril has no income, and I do not receive any child support from him.

6.    I am a full-time graduate student pursuing cinema studies at the New York University Tisch School of the Arts. It is a scholarly program looking at the role of the moving image in society. I hope to get a job in television. While I work towards my master's degree, I have been going to auditions, writing treatments, pitching show ideas, and have obtained part-time jobs in order to earn some income for my daughter and myself. I plan to pursue my doctorate degree as well.

7.    From November 2005 through December 2006, I was employed part-time as a licensed city tour guide. I had two shifts per week, on and off, since there were clear tourist seasons and clear lulls. It wasn't steady work. In December 2006, between Christmas and New Year's Day, Pascale got sick with the flu. So I had to stay home to take care of my daughter. I couldn't go to work. I called in sick to my job, and they fired me.

8.    In July 2007, I became employed part-time on a free-lance basis, writing advertising proposals for a company. I earn $50 per hour for my services. My income fluctuates based on my assignments.

9.    In 2006, while I was working as a licensed city tour guide, my adjusted gross income was $7,467 for the year, which is less than 100% of the federal poverty level for our family of two. After I was fired, from January 2007 through June 2007, I collected unemployment. From July 2007 through October 2007, I earned some income from my new free-lance work. The company had a huge project due around

2

Labor Day, so there was a big push leading up the deadline. My free-lance work has been pretty quiet since. So far this year in 2007, my annual income has been approximately $20,000. This averages out to less than $1,700 per month to cover the needs of my daughter and myself. I wish that I could bill more hours, but school has to be a priority. I have spent 18 months working towards my master's degree so that I can build a better future for my daughter and myself. I can't sacrifice that for a little more money right now.

        10.     We have approximately $3,700 in monthly expenses. I pay roughly $540 per month on rent for our apartment; $425 per month on food; $120 per month on transportation; $410 per month on daycare for my daughter; $137 per month for my own health and dental insurance; $177 per month for my daughter's health insurance; $130 per month for electricity; $80 per month on phone services; $80 per month on cable and internet services; $500 per month on school loans; $300 per month on credit card payments; and $800 per month for child care. In order to manage these monthly expenses, I have borrowed $20,000 from my father, my mother, and several friends. I have also assumed a debt of $65,000 in financial aid for school loans.

        11.     I have always tried to maintain continuous health insurance for myself and my daughter. From June 2004 through January 2006, I was insured through a COBRA plan from my previous employer. From January 2006 through August 2006, I obtained insurance through my husband's coverage with Freelancers Union. Since August 2006, I have been insured through New York University while I pursue my graduate studies.

3

12.    Pascale had been insured through her father's Freelancers Union coverage. However, since he did not work this year, I learned that their coverage lapsed this past summer, which meant that Pascale was uninsured.

13.    I explored the option of adding Pascale to my insurance plan through New York University. It would cost $380 per month to add her dependent coverage, which was too expensive.

14.    On August 14, 2007, I went to the Children's Aid Society to seek assistance. I met with Mr. Lance Goller, who is Enrollment Supervisor of the organization's Health Care Access Program. I just need help for this one year until I graduate and can get back on my feet. He shared information with me about the free or low-cost medical care available in New York through Child Health Plus (CHPlus). He told me that the State had expanded eligibility criteria for this subsidized insurance program, and I would qualify for a $20 monthly premium based on my income level. He filled out an electronic application for me in his computer to quickly enroll Pascale. The following day, on August 15, 2007, I wrote a $20 check to Empire Blue Cross Blue Shield for Mr. Goller to deliver with my application. He immediately filed and submitted all the paperwork on my behalf.

15.    On August 30, 2007, Pascale and I attended a press conference with Governor Eliot Spitzer and Senator Hillary Clinton where they called on President George W. Bush to remove certain rules instituted by his administration that would deny reasonably-priced quality health care to New York children, like my daughter. I was asked to share our story. I explained that I attend school, I work hard, I vote, and I play

4

by the rules, yet still cannot afford health care for my daughter. We were very excited

because Pascale's new coverage through CHPlus would be effective in just two days on

September 1, 2007.

        16.    In early September 2007, I received the CHPlus insurance card for

Pascale issued by Empire Blue Cross Blue Shield.

        17.    A few days later, I received a bill dated September 5, 2007 from

Empire Blue Cross Blue Shield indicating $533.16 as the total amount due for a three-

month period of September 1, 2007 through December 1, 2007. That is a $177.72 full

monthly premium, as opposed to the $20 reduced monthly premium that I anticipated.

My heart stopped. I panicked. I didn't know if I could afford this payment. I thought

that there might be another letter to follow telling me to "please disregard" this costly bill,

and that the $20 monthly premium had not kicked in yet. But then I connected the dots.

From what I could gather, Governor Spitzer wants me to have a $20 monthly premium;

President Bush does not. I figured that President Bush won. I called Mr. Goller at the

Children's Aid Society for guidance. He told me that I would need to pay the higher

premium of $177.72 per month if I wanted the health insurance for Pascale. I felt like

the rug had been pulled right out from under me.

        18.    Pascale is currently insured through CHPlus. I submitted a check

for $513.16 on September 21, 2007 to Empire Blue Cross Blue Shield for the remaining

balance on the billing period of September 1, 2007 through December 1, 2007. On

October 2, 2007, I received another bill for $177.72 for the billing period of December 1,

2007 through January 1, 2008.

19.     It is not easy for me to make these insurance payments. The fact that I will have to pay a much higher monthly premium for Pascale's insurance coverage places financial strain on us. It adds ever more pressure on me to go into further debt to my family and friends. To save money, and pay for Pascale's insurance coverage, we will have to cut out some activities that would be meaningful and fun for her. Health insurance has to come first.

20.     Pascale is a healthy little girl, and I want her to stay that way. So it is important for her to have health coverage. Pascale has had the same pediatrician since she was born. I have always kept meticulous records of her growth and development charts (*e.g.* when she learned to say "mamma" and "dadda," drink from a cup, roll over, or jump in place). It is essential to bring Pascale to the doctor for regular check-ups to make sure that she is developing as she should be. On October 16, 2007, we had a routine visit with her pediatrician and she got two immunization shots.

21.     On October 27, 2007, Pascale unexpectedly rolled out of bed at her father's house and cut her chin. He called me and said she was fine. But when he dropped off my daughter the next day, I saw that she was not fine and I called our pediatric nurse. She advised me to take Pascale to the emergency room where they could clean and bandage the wound. I was very emotional. The entire taxicab ride to the hospital, I was clutching the CHPlus insurance card in my wallet. I just knew that we would be okay because Pascale had health coverage.

6

22.    If something really terrible happened, and Pascale wasn't covered, I don't know what I would do. One serious illness or episode, and I'm bankrupt. What kind of parent would I be? I have to provide for Pascale, and that responsibility includes healthcare. Her father let her insurance lapse; I refuse to do the same. Having coverage for Pascale makes life manageable so that I'm not worried all the time.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 7, 2007.

AMY MARGARET MCCUTCHIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

MORGANNE MILES, by her mother KRYSTAL TITUS,
et al.,

                      Plaintiffs,

      - against -

MICHAEL O. LEAVITT, as Secretary of the United
States Department of Health and Human Services,

                     Defendant.

-------------------------------------------------------------------------x

**08-CV-432 (PAC)**

**ECF CASE**

**DECLARATION**


## DECLARATION OF SUNNY CHAN

SUNNY CHAN declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I am the father of Theo Chan, age 3½ , and Leah Chan, age 5 months, and I respectfully submit this declaration in support of this action.

2.  I am married to Ms. Edith Tay.  Our family resides at 1720 85th Street, Third Floor, Brooklyn, NY 11212.

3.  My family and I are being injured because without the expansion in the Child Health Plus program in New York, we cannot afford health insurance for our children.

4.  My wife was employed at the Gemology Institute of America as a quality control analyst until May 2004, when our son Theo was born.  At that point she left her job to stay home with the baby so that we could save money on child care.

5.  Since August 1991, I have been employed at Multicultural Radio Broadcasting, Inc. as a full-time production and deputy general manager.

6.  In 2006, my gross annual income was approximately $74,000, which is roughly 360% of the federal poverty level.  Although Edith is a freelance voice talent, she was not fortunate enough to get any work in 2006.

7.  Currently, our monthly net income is approximately $3,890, which must cover all the needs for our two children, my wife and myself.

8.  We have approximately $4,240 in monthly expenses.  Our regular monthly expenses are as follows:

| EXPENSE | MONTHLY AM'T |
|---|---|
| Rent | $1,200.00 |
| Health and Dental Insurance ($560 for adults + $355 for kids) | $ 915.00 |
| Health and Dental Expenses | $85.00 |
| Car Insurance | $208.00 |
| Electric | $110.00 |
| Home Telephone, Cable, Internet | $110.00 |
| Cellular Phone | $90.00 |
| Gasoline | $120.00 |
| Car Maintenance | $40.00 |
| Clothes and Shoes | $100.00 |
| Groceries | $220.00 |
| Life Insurance (Edith) | $67.00 |
| Student Loan (Sunny) | $150.00 |

2

| | |
|---|---|
| Credit Card | $625.00 |
| Health Club (Edith and Sunny) | $100.00 |
| Medical Debt from Leah's Birth | $100.00 |
| **TOTAL** | **$4,240.00** |

9.  We also have a lot of financial debt that is putting great stress and pressure on our family.  We owe over $30,000 to credit card companies and $500.00 in medical debt. We are struggling to make payments on our debts as best as we can.

10. From 2005 through July 2007, our son Theo had health insurance through Child Health Plus (CHPlus).  The premium cost was roughly $150 per month.  We also had to pay approximately $560 per month to cover my wife and myself through my employer-based insurance.  I had trouble making the CHPlus payments on time, and as a result, Theo was uninsured from July 2007 until October 2007.

11. In September 2007, I went to the Children's Aid Society because I knew that I needed to get health insurance for Theo and our newborn baby, Leah.  I was told by a facilitated enroller at the Children's Aid Society that we would be able to pay a reduced premium of $40 per month per child to secure subsidized insurance coverage for our children. I immediately wrote a check for $80.  My check was never cashed, however, and one week later the facilitated enroller called and told me that the law changed and that the monthly premium to cover both of our children would be $355.

12. In October 2007, we received a letter from Empire Blue Cross and Blue Shield stating that we would need to pay $1,066 to cover both of our children through

3

January 2008 and that the total amount was due immediately. I had already paid for coverage

for the month of November. The only reason I was able to pay the rest of the balance due

was because Edith received a check for $2,250 for a commercial voiceover that she recently

did.

13. Even though it is very difficult for my family to afford to pay the higher

CHPlus premium, I saw no other option. Both of our children now have CHPlus through

Empire Blue Cross and Blue Shield. We pay $355 per month for our children's insurance,

but I don't know how I will be able to keep up those payments without going further into

debt.

14. My wife and I are both insured through my employer. I pay $560 per

month to insure myself and my wife. Our medical expenses do not end there. I am a

diabetic and so we spend $75 per month on insulin and other diabetic supplies. Also, every

three months, I need to get a special check-up and the co-pay is $30.

15. Right now only Edith has a life insurance policy. I do not have a life

insurance policy because we cannot afford it. A policy on my life would be too expensive for

my family because of my diabetes. I would like to be able to obtain life insurance because I

am very worried that my wife and two young children will not be taken care of if something

were to happen to me.

16. Our son Theo is very active. It is important to us that he has health

insurance coverage in case he hurts himself. He also suffers from an allergic reaction to

something that he eats. We do not know which food or foods that he is allergic to but the

doctor said that it may be MSG. When Theo has an allergic reaction, he gets rashes on his

4

face and body and we have to give him an antihistamine.

17. Our newborn daughter Leah is generally healthy, but because she is just five months old, she needs a lot of check-ups and vaccinations. However, she has developed severe bronchitis. She needs a nebulizer to help her breathe and has to take asthma medication. We are very relieved that these items are paid for by CHPlus. Leah had a check-up in December, and the doctor says she needs another one in January 2007.

18. The fact that we have not been able to get subsidized insurance coverage through CHPlus is causing my family economic hardship. We believe that it is very important for our children to have health insurance coverage and so we are trying to be proactive about the situation, but it is very difficult to do this and to meet our family's other needs.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 8, 2008.

SUNNY CHAN

5